# WILLARD E. LELAND

## vs.

## EMPIRE ENGINEERING CO.

*Negligence—Defecitve Post on Pier—Expert Evidence—Re-opening Case—New Evidence—Inevitable Accident.*

In an action against an engineering company, engaged in rebuilding a pier, for injuries caused by the giving way of a post around which the plaintiff had to pass while walking on a stringer, it was improper to ask an expert in pier construction whether, he having heard the testimony as to how this and other posts were secured, would consider the posts sufficiently secured to make it reasonably safe for one to walk on the stringers and pass around the posts, there being evidence that the numerous other posts around which plaintiff had to pass were securely fastened, and that this post was possibly left unfastened by mistake, an expert not being required to prove that a post left unfastened was not sufficiently secured to make it reasonably safe. pp. 211, 213

The exclusion of the opinion of a witness as to the proper method of fastening a post, such as that which gave way to plaintiff's injury. was not cause for reversal, when there was evidence that this post had not been fastened at all, while other posts around which plaintiff had to pass were fastened securely. p. 213

That after the taking of testimony was concluded, and after argument on the prayers, defendant's counsel, in the hearing of the jury, stated that he had discovered two eyewitnesses of the accident, and asked that he be given two or three hours in which to produce these witnesses, is not cause for reversal, there being nothing to indicate bad faith in the proffer of such testimony, and there being no requirement that an offer of evidence be made out of the presence of the jury. pp. 214-216

It is in the discretion of the trial court to grant or refuse a motion to reopen the case for the purpose of introducing newly discovered testimony.

To the lower court is left a great deal of discretion which can be exercised for the protection of litigants by granting new trials, and that jurisdiction must be clearly abused to justify the interference of the Court of Appeals. p. 216

An instruction that the verdict must be for defendant if the jury find that the injury to the plaintiff resulted either from unavoidable accident or was occasioned in any way by the want of due care on the part of plaintiff is liable to mislead, as merely stating the proposition of law that one is not liable for injuries caused by unavoidable accident, without informing the jury what the law regards as an unavoidable accident, or qualifying the prayer by telling the jury that defendant might be guilty if the jury found that it had been negligent. pp. 217-219

An accident, which furnishes no cause of action, is an inevitable occurrence, not to be foreseen and prevented by vigilance, care and attention, and not occasioned or contributed to, in any manner, by the act or omission of the defendant, its agents, employees or servants. p. 217

That plaintiff, invited by defendant out upon a pier in course of construction, to test a certain machine, did not remain at a particular place on the pier as instructed, did not justify the direction of a verdict for defendant on the ground of contributory negligence, where there was evidence that the post around which he sought to pass gave way because not properly fastened, while the numerous other posts on the pier around which he had passed were well secured. p. 219

*Decided November 21st, 1919.*

Appeal from the Superior Court of Baltimore City (HEUISLER, J.).

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ.

*Louis S. Ashman,* for the appellant.

*William Fell Johnson* and *Edgar Allan Poe,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

The appellant was employed as a salesman by John C. Lewis, who represented in Baltimore City manufacturers of contractors' supplies and pneumatic tools. Frederick W. Gaw was the sales engineer of the manufacturers. Pier No. 9 belonging to the B. & O. R. R. Co. had burned to the water's edge and was being rebuilt by the appellee. Amongst other things those manufacturers sold wood boring machines and spike driving machines. Their representatives had two wood boring machines and one spike driving machine at the office of the McLean Contracting Company, which was rebuilding Pier No. 8, and Mr. Howden, who was superintendent and chief engineer for the appellee, proposed that they give a demonstration of the wood boring machines on Pier No. 9. Mr. Howden carried the wood boring machine and Mr. Gaw carried the spike driving machine, and they and the plaintiff went out on Pier No. 9 for the purpose of having the demonstration. The piles had been sawed off evenly at the water's edge and there were stringers upon the piles, running parallel with the shore, of different lengths but having a uniform breadth and thickness of one foot. Upon some of the stringers there had been erected upright posts about six feet high and one foot square. The upright posts were temporarily nailed to the stringers by 20-penny nails. At various intervals there were also what are called "dummy clusters," which were a number of piles covered with caps, making a kind of platform. The distance between the stringers was about six feet, and that between the dummy clusters and the stringers was from four to five feet. There were planks a foot wide from one stringer to another to walk on, but as the planks were not in line they went in a zig-zag sort of way—after going over the plank they would walk on a stringer to reach another plank and in doing so would, as claimed by appellant, have to get around the post. The appellant said that in getting round the posts, which were of the same width as the stringers, they would have to

take hold of them to balance themselves. Mr. Howden took the lead, Mr. Gaw followed him, and the appellant followed him. The appellant testified that as he was about to go around a post he took hold of it and it fell, throwing him into the water and he was very seriously injured, either by the post falling on him or his coming in contact with other materials. He claims that the post which fell was not properly fastened and that it was negligence in leading them into such a place. Al trial of the suit he brought resulted in a verdict for the defendant and from a judgment entered thereon this appeal was taken.

The defendant contended that there was a walk in the center of the pier of two planks in width, that there was no occasion to go around the posts and that the post which fell was fastened as the others were, but that the appellant undertook to jump from one place to another, grabbed the post and fell with it. Mr. Howden testified that he told Mr. Gaw to put the machine he had on a dummy cluster, which he did, and told the appellant to wait there, but without his knowledge he started to come on. They were going to a point where the demonstration was to take place which would be convenient to connect it with a tank of compressed air.

There are four bills of exception, the first two of which are in regard to the admissibility of evidence, the third embraces an offer made by counsel for defendant in the presence of the jury, and the fourth presents the rulings on the prayers. The plaintiff produced in rebuttal Mr. Edward J. Monaghan, an expert, who testified that he was in charge of rebuilding Pier 8 which was alongside Pier 9, and was being rebuilt along the same principles as Pier 9. The attorney for the appellant asked Mr. Monaghan whether he was in Court and heard the testimony as to how the posts were secured, and after stating that he was, he was then asked: "Would you consider those posts sufficiently secured to make it reasonably safe for a man to walk on the stringers and pass around the posts to get over on the other side of the stringer?"

That was objected to and ruled out—the ruling·being presented by the first bill of exceptions.

The appellant had testified that they had gone around approximately fifty posts and Mr. Gaw said possibly 25, or may be 30 or 40 posts before the accident, and neither of them spoke of any of· them being insecurely fastened except the one. The appellant testified that he followed Mr. Howden zig-zagging in and out from many of those posts. He was asked: "How did you find those posts," and answered, "They were absolutely fast. We had already passed numbers of them." The Court then asked him: "Approximately how many posts had you passed?" And he replied: "About fifty in finding this place where we were to go." Again, he said: "Yes and as I passed numbers of posts I took particular care to watch my steps and reached out to take hold of those posts as the others did and there was no giving way at my hands with the posts I had passed, but with this particular post the whole thing gave way with me." Then this is in his evidence: "Q. These other posts that you passed around, did you grab a hold of them in the same manner as you did this particular one that caused the accident? A. Yes, as that was the only way you could get around. You had to steady yourself to go around them and then put your arms around that way (indicating) * * *. Q. And as I understood you to say, you got around this post the same way as the others and the others were absolutely fastened? A. Yes, they were absolutely right and fastened securely." Mr. Gaw testified that as he was passing the post where the accident occurred he noticed that it was unsteady and as he turned to warn the appellant he was falling into the water with the post. He said that after the accident: "I called to Mr. Howden and Mr. Howden came over to me and I remarked to Mr. Howden, why didn't you warn us that this post was unfastened. And he replied that it was possibly left unfastened by mistake."

With such evidence before the Court and jury we·cannot understand upon what theory the question in this exception could be admissible. It did not require an expert to

prove that a post left unfastened was not sufficiently secured to make it reasonably safe, and the plaintiff proved that the other posts were absolutely right, and fastened securely. In the second exception Mr. Monaghan was asked: "Is that the usual and approved method of doing it," and answered: "We try to fasten them with heavier nails than that." Upon being told to first answer, yes or no, and then give his reason, he asked to have the question repeated, and, after that was done, replied: "There are different methods of doing that work and I do not care to make any statement about what the other man does." Then this follows: "(The Court): Simply say whether or not that is the general approved method of securing those posts? A. That is one preliminary step which some people take. (Mr. Ashman): "What in your opinion is the approved and usual method of doing it? (The Court): Is there any general approved method of doing it? A. The methods differ. Q. Then there is no similar approved method? A. No. Q. Does this method of securing these uprights to the stringers lie in the judgment of the man doing the work? A. Yes, and according to the plans and specifications and the engineer in charge of the job." The Court then said: "I will change my ruling and strike out the opinion of Mr. Monaghan and his answer now stands this way: There are different and various methods of securing the uprights adopted by different and various builders, and that is all he has to say."

There could be no possible injury to the appellant resulting from that ruling. There was nothing material in what was said by Mr. Monaghan, and beyond that the question raised by appellant really was whether the post had been fastened at all. If it was not, the evidence offered was wholly immaterial, and the jury could infer whether the falling of this one was the result of negligence on the part of the defendant, as the plaintiff had proven that all of the others were *absolutely right and fastened securely.* There was, therefore, no reversible error in either of those exceptions.

The taking of testimony was concluded about Noon on December 13th, and after argument on the prayers the jury

was discharged until 10 o'clock the next morning, when the Court convened and the jurors took their seats in the jury box. Mr. Poe, of counsel for defendant, arose and while standing at the trial table, in the presence and hearing of the jury, addressed the Court as follows: "If it please your Honor, we have just discovered two eye-witnesses to this accident, one a white man named William Barringer, a master mechanic no longer in the employ of the defendant, but now with Bartlett Hayward Company, and the other a colored man still in the employ of the defendant. We can have the colored man in Court within about an hour and the master mechanic within two or three hours. It was through no fault of ours that we did not discover those eye-witnesses before. It would prove a great injustice to us if we were denied the privilege of putting these witnesses on the witness stand to testify in support of our side of the case." Mr. Poe, at the suggestion of the Court, dictated to the stenographer, who was absent when the motion was first made, out of the hearing of the jury, his application, which is set out in this record but need not be repeated in full in this opinion, although different somewhat from the offer quoted above, but not in substance.

When the stenographer completed a record of this renewed offer, the Court called the stenographer and counsel to him, and quietly and out of hearing of the jury had the record read to the Court by the stenographer. Then the Court told counsel to take their places at the table and simply announced in the presence and hearing of the jury that the Court would refuse the request of the defendant's counsel. Counsel for the plaintiff made no statement within the hearing of the jury, but quietly stated to the Court that they did not believe that the case should be delayed in view of what the record showed. The bill of exceptions concludes: "And the plaintiff excepts to the conduct of defendant's counsel and prays the Court to sign and seal this his third bill of exceptions, which is accordingly done this 18th day of June, 1919."

We are not satisfied from the record that an exception was taken, or anything done, by the appellant that would enable us to consider this bill of exceptions. The occurrence complained of was on the 14th day of December, 1918, but there is nothing in the record to show that an exception was then noted to the conduct of the attorney or action of the Court, or that any motion was made by the defendant or anything done which called upon the Court to do more than it did—pass on the offer made by the defendant, which it did in plaintiff's favor, as the offer was denied. But assuming that it is properly before us, we can find nothing in what took place which would justify a reversal. The attorney for the appellant, at the oral argument, and in his brief, disclaimed any intention of reflecting upon the good faith of Mr. Poe, although he did challenge the good faith of Mr. Miller, the vice-president and manager of the defendant, who gave Mr. Poe the information. There is nothing in the record to sustain that charge. It is quite possible that after Mr. Miller discovered these parties he did not suppose that the Court would, or possibly could, reopen the case and permit the witnesses to testify, and hence did not have them in Court that morning, or he may not have heard of them in time to do so. He very properly informed his counsel of what he knew or had heard and' we would not be justified in assuming that he was not acting; in good faith.

But if the position taken by the appellant is correct an attorney could not safely make a proffer of testimony in the presence of the jury unless he was thoroughly satisfied that it would be admitted. No attorney has the right to make a proffer of testimony simply for the purpose of getting it before the jury, and while the Court may have reason to suspect that that is done in some particular instance, and if satisfied that it was done for such purpose might be justified in granting a new trial, and even disciplining the attorney making it, the Court should proceed with great care before adopting such measures. At every term of the Court there are many exceptions before us on the ground that evidence has

been improperly excluded and in most instances it must have been offered and ruled on in the presence of the jury. It would greatly and improperly prolong trials if the jury had to be excluded every time there was a new proffer of evidence. Evidence may be of great importance to the one side or the other, if admitted, but if a new trial could be had because it was proffered and rejected in the presence of the jury, its rejection would oftentimes be of more value than its admission. There is nothing in the proffer which can properly be said to be improper. It does not state what the witnesses would testify to. Of course the jury might assume that the attorney for the defendant thought the evidence would be in its favor, as otherwise he would not have offered it, but just what the witnesses would have said, or what the defendant expected to prove by them, the record does not disclose. The Court below had the discretion to reopen the case and allow the defendant to produce the witnesses (2 *Poe,* 288A) and hence the attorney not only had the right, but, if he deemed it important from the information he had, it was his duty to his client to ask to have the case reopened. It would, we must also assume, be a very unusual jury which would be influenced in its verdict by such a proffer as this. Jurors who would be would not be fit to serve.

This case is wholly different from *Rosenburg* v. *Ambrose,* 129 Md. 418. There evidence had been stricken out in the absence of the jury, and both Court and attorneys overlooked the fact that when the jury was brought back into the Court room it had not been informed that it was stricken out. It therefore remained for the jury's consideration, as they had the right to consider that together with other evidence before them. Nor are the other cases cited by the appellant, *Latham* v. *United States,* 226 Fed. 420, L. R. A. 1916 D. 1122 and *Tucker* v. *Henniker,* 41 N. H. 325, analogous to this. Moreover, under our practice, to the lower Court is left a great deal of discretion which can be exercised for the protection of litigants by granting new trials, and that discretion must

be clearly abused to justify the interference of this Court.
There is nothing of that kind in this case.

The defendant's fourth prayer instructs the jury "that
their verdict must be for the defendant if the jury find that
the injury to the plaintiff resulted either from unavoidable
accident or was occasioned in any way by the want of due
care on the part of the plaintiff." That is an unusual and
would be a dangerous prayer in perhaps most cases, as liable
to mislead. It is true that in *B. & O. R. R. Co.* v. *State, use
of Savington,* 71 Md. 590, 599, this Court quoted with ap-
proval from *Parrott* v. *Wells Fargo & Co.,* 15 Wall. 524,
537, that: "No one is responsible for injuries resulting from
unavoidable accident, while engaged in a lawful business. A
party charging negligence as a ground of action *must prove
it.* He must show that the defendant, by his act or his omis-
sion has violated some duty incumbent upon him, which has
caused the injury complained of." That was repeated in
*Pillard* v. *Ches. Steam Co.,* 124 Md. 468, 474, and there can
be no doubt that such is the law. But this prayer was in our
judgment liable to mislead the jury by merely stating that
proposition of law without informing them what the law
regards as an unavoidable accident, or qualifying the prayer
by telling the jury that the defendant might be guilty if the
jury found that it had been negligent in placing the post
in position. JUDGE McSHERRY said in *Washington, etc.,
Turnpike* v. *Case,* 80 Md. 36, 45, that "for a mere accident,
*unmixed with negligence or fault on the part of the person
to whom it is attributed* (italics ours), no action will lie."
He went on to say: "An accident, then, which furnishes no
cause of action, is an inevitable occurrence, *not to be foreseen
and prevented by vigilance, care and attention, and not occa-
sioned or contributed to, in any manner, by the act or omis-
sion of the company, its agents, employees or servants.*
(Italics ours.) In *Sullivan* v. *Smith,* 123 Md. 546, 553, the
defendant's first prayer is referred to as not being objected
to, but it read that if the jury found "that the injuries com-
plained of resulted from unavoidable accident unmixed with

negligence on the part of the servant of the defendant in charge of the automobile referred to in the evidence, then the verdict of the jury must be for the defendant," and then went on to define negligence. We said that there was no reversible error in granting either of the prayers of the defendant which were granted, and hence that prayer was approved in the form presented, and it had the qualification which we understand to be necessary—at least when there is evidence of negligence on the part of the defendant tending to show that it caused the accident.

As we have seen, the appellant contends that the appellee was guilty of negligence in not fastening more securely the post that fell. If that is the case it cannot properly be said as a matter of law that this was an unavoidable accident within the meaning of that term as defined by the authorities. The jury cannot be supposed to know what the law regards as an unavoidable accident, and they certainly were not authorized to exclude from their consideration of the question what the defendant did or omitted to do, if anything, in reference to making the posts and the place reasonably safe for those having the right to be there. A party is liable for the combined consequences of an accident and his own negligence, if the one injured is not at fault. 21 *Am. & Eng. Enc. of Law*, 498, n. 1; 20 R. C. L. 17-18. As to unavoidable accident see 1 *Cyc.* 652; *C. & O. Ry. Co.* v. *Burke,* 147 Ky. 694, 145 S. W. 370, and cases in 4 *Words & Phrases* (2nd Ed.) 1040, also 2 *Words & Phrases,* 1055, as to "inevitable accidents" which is said to be synonymous with unavoidable accidents. 20 *R. C. L.* 17-20. Without making further citations of authority it seems clear that if the defendant failed to exercise proper care in the setting and fastening of the post it could not escape on the ground that it was an unavoidable accident, and under the circumstances of this case the prayer should have submitted the question to the jury, and not simply whether it was an unavoidable accident with no instructions as to what was so regarded in law, or whether the defendant's negligence combined with the acci-

dent.   The concluding part of the prayer is not in accord
with the established practice in this State, although we would
not be inclined to reverse the judgment by reason of that
alone.

Nor do we think that the sixth prayer should have been
granted under the circumstances.   If the post was not prop-
erly fastened and the accident happened as the plaintiff testi-
fied it did, even if the jury find (using the language of the
prayer) that "Mr. Howden instructed and directed the plain-
tiff to remain at a certain place to look after a certain spike-
driving machine because of the crowded condition at the
place of demonstration, and they further find that before the
return of Mr. Howden the plaintiff attempted to leave his
position voluntarily, and of his own accord, and in so doing,
the accident occurred," that did not justify the direction of
a verdict for the defendant.   In the first place the plaintiff
testified that he did not hear such instruction and direction,
but if he had heard it, there was nothing to warn him of any
particular trouble about that post or at that place.   He had
found a number of posts which he said were properly fast-
ened, but claimed that this one was not.   The prayer ignores
the plaintiff's version of the accident.

So without further prolonging this opinion we are forced
to the conclusion that there was error in granting the defend-
ant's fourth and sixth prayers and the judgment must be
reversed.

*Judgment reversed and new trial awarded,
the appellee to pay the costs.*